## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 28 2017, 7:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT C.C.

Erin L. Berger
Evansville, Indiana

ATTORNEY FOR APPELLANT R.M.

Julianne L. Fox
Vanderburgh County Public Defender's Office
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: J.D., T.D. and H.F., Children Alleged to be in Need of Services,

C.C. (Mother) and R.M.,

*Appellants-Respondents*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

February 28, 2017

Court of Appeals Case No.
82A01-1606-JC-1438

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemier, Judge

The Honorable Renee A. Ferguson, Magistrate

Trial Court Cause Nos.
82D04-1512-JC-2131
82D04-1512-JC-2130
82D04-1512-JC-2127

**Brown, Judge.**

[1] C.C. ("Mother") and R.M., Mother's boyfriend, appeal the juvenile court's order determining that J.D., T.D., and H.F. (the "Children") are children in need of services ("CHINS"). They raise one issue which we revise and restate as whether sufficient evidence supports the juvenile court's determination that the Children are CHINS. We affirm.

*Facts and Procedural History*

[2] Mother had J.D., born June 27, 2007, T.D., born December 22, 2008, and H.F., born September 22, 2011.[1] In July 2014, Mother began a relationship with R.M. When Mother worked, R.M. or Mother's mother cared for the Children.

[3] On November 20, 2015, Department of Child Services ("DCS") assessment worker Eniko Krizsovenszky received a report and went to the Children's home. R.M. reported that he was at home with the Children while Mother worked. R.M. was frustrated and reported there had been several allegations regarding the family in the past and that "this was an ongoing issue." Transcript at 63.

[4] On December 7, 2015, Krizsovenszky requested that R.M. submit to a drug screen, and R.M. complied. Krizsovenszky instructed Hi-Tech Investigative

---

[1] D.D. is the father of J.D. and T.D., and J.F. is the father of H.F.

("Hi-Tech") to give R.M. a rapid drug screen at the office, Hi-Tech did so, the sample tested positive, and Hi-Tech sent the sample to Redwood Toxicology for confirmation.

[5] The next day, William Grant Wargel and Brittany Harper, DCS assessment workers, were notified of a positive drug screen and made contact with the family. Mother told Wargel that she was not aware of any drug use in the home. Wargel asked R.M. about the positive drug screen, and R.M. initially denied and then admitted that he had snorted a line of methamphetamine approximately two or three days prior at a party. R.M. was upset that DCS workers were at his home. Wargel then spoke with Mother, who was concerned over the positive screen, visibly upset, and crying, and "it was decided that [R.M.] would leave the home in order for her to be able to stay at the home" with the Children. *Id.* at 35.

[6] On December 10, 2015, DCS filed petitions alleging that the Children are CHINS. The petition listed R.M. as the "Custodian" and alleged that he submitted to a random drug screen and tested positive for methamphetamine, amphetamine, benzodiazepine, and THC. Appellant's Appendix at 33. DCS alleged that it had not been able to locate the fathers.

[7] On January 8, 2016, Krizsovenszky scheduled a meeting, but the meeting ended early due to R.M.'s "erratic behavior and threatening demeanor." Transcript at 67. On January 27, 2016, family case manager Lavonne Givens ("FCM Givens") visited the residence, Mother told her she could not go inside,

and R.M. came out of the residence and told FCM Givens "to get the f--- off his property or else he would call the police." *Id.* at 80-81.

[8] On February 8, 2016, the court held a factfinding hearing. During direct examination, R.M. testified that he said during the January 8th meeting that he would like to see CPS dismembered and "[t]hat means broken apart." *Id.* at 25. He also testified that he never used methamphetamine. When asked later if he smokes marijuana, uses methamphetamine, or admitted to using methamphetamine to the family case manager, he stated: "I plead the 5th." *Id.* at 29-30.

[9] Harper testified that on December 8, 2015, R.M. admitted using methamphetamine two or three days earlier at a party. When asked the significance of the sobriety of a caregiver, Krizsovenszky answered: "Basically we want to ensure that the care givers and parents are drug and alcohol free, so they're clean and sober so they can take care of the children properly." *Id.* at 60. She also testified that being drug and alcohol free is important because "drugs such as methamphetamine, cocaine, or any other illegal substance are mind altering substances and they alter the care giver's decision making and supervision." *Id.* at 60-61. She also testified, over objection, that she did not believe children are safe when the parents are under the influence of illegal substances. When asked what impact methamphetamine has on a parent's ability, she answered: "Methamphetamine is a mind altering substance so methamphetamine use alters a person's decision making skills, supervisor skills, and a lot of times behavior changes, erratic behavior. So it would put the

children at risk." *Id.* at 67. She also testified that R.M. admitted to using THC on several occasions. With respect to the January 8th meeting that ended early, she testified:

> [R.M.] was very volatile, he was cursing. And he stated multiple times that he wanted CPS . . . referring, we believe, me and the ongoing worker . . . to be dismembered. And then he also continued when we asked him to stop and questioned my citizenship status and referred to the Constitution and stated that he's gonna find out if I'm even a U.S. citizen, and continued on, so we left the home.

*Id.* at 68. She also testified that after the initial hearing, R.M. yelled "You c--- b----." *Id.* at 69.

[10] FCM Givens testified that the January 8, 2016 meeting ended early because R.M. "stated that all DCS employees should be dismembered," asked Krizsovenszky about her nationality, and stated that she was not American and could not speak English correctly. *Id.* at 79. When asked if she observed any comments or actions from R.M. that would give her any concerns for the safety of the Children, she mentioned when R.M. "said that all DCS employees should be dismembered" and that R.M. "cussed at [her] and told [her] to get the f--- off his property." *Id.* at 83-84.

[11] On March 2, 2016, the court continued the hearing. Marvin Barner, an employee of Hi-Tech, testified regarding the collection procedures and that he collected the specimen from R.M. on December 7, 2015, and followed the collection procedures. John Martin, a toxicologist employed by Redwood

Toxicology Laboratory, testified that samples are checked for integrity at the time of receipt, whether the security seal is intact, whether the information is legible, and whether the sample leaked. He testified that he received a sample from R.M. that was collected on December 7, 2015, the sample was properly identified, and there was no indication of tampering with the seal. He stated that the label that was attached to the urine sample indicated that the collector was Marvin Barner, the patient was R.M., the collection date was December 7, 2015, and that the sample tested positive for methamphetamine, amphetamine, and THC.

[12] FCM Givens testified that a service of supervised visitation for R.M. had been set up, but R.M. had not participated. She testified that DCS felt that R.M. needs to complete substance abuse evaluation and follow all recommendations and that R.M. needs to remain drug free.

[13] Mother testified that R.M. is a father figure to the Children, spends a lot of time with them, and was alone with them at times. On cross-examination by R.M.'s counsel, when asked if she believed that someone in that role should be free from the influence of drugs and alcohol, Mother answered: "To some extent, yeah." *Id.* at 145. When asked if she would ever allow R.M. to be around the Children if he was impaired by drugs, Mother answered: "Yes." *Id.* She also testified that she had never seen R.M. impaired by drugs or use drugs around the Children. On redirect examination, Mother's counsel asked her what she meant by her answer that someone should be free from drugs and alcohol to some extent, Mother answered: "Certainly methamphetamine, no, they should

not be under the influence. Marijuana is a completely different drug. To me that's not going to impair his ability to take care of the kids like methamphetamine would." *Id.* at 146. When asked what safeguards she has in place after leaving the Children with R.M., she testified that she speaks to R.M. on every single break she has at work and sometimes other family members show up at their home. On recross-examination by DCS's counsel, Mother testified that she had seen R.M. use marijuana several times when she and R.M. "get nights to ourself [sic]," that he keeps the marijuana outside of the house, and that she would not allow marijuana in the house for the safety of the kids. *Id.* at 148. R.M. testified that he had never used methamphetamine, that he smokes marijuana, and that he had never been impaired around the Children.

[14] On May 17, 2016, the court entered an order which states in part:

**Findings of Fact**

\* \* \* \* \*

7. At the time the DCS became involved with the family, in November of 2015, the [Children] resided with [Mother].

8. At the time the DCS became involved with the family, in November of 2015, [Mother's] boyfriend, [R.M.] (hereinafter referred to as "custodian") also resided with the children and mother.

9. [Mother] and the custodian have been in a relationship for approximately two (2) years.

10. In December of 2015, [Mother] worked third shift and the custodian cared for the children while [Mother] was at work.

11. The custodian also frequently provided care for the children for long periods during the day.

12. On December 7, 2015, the custodian was drug screened by the DCS and tested positive for both methamphetamine and marijuana.

13. The custodian testified at trial that he had concerns about the chain of custody of the urine specimen that tested positive for methamphetamine. However, the collector of the specimen, Marvin Barner, testified that the label marking the specimen as [R.M.'s] was placed on the specimen. The custodian signed a donor certification on the collection paperwork stating that the specimen was his unadulterated urine, sealed in his presence with a tamper evident seal, and that the information affixed to the specimen tube is correct. The toxicologist from Redwood Toxicology Laboratory testified that the specimen sample that they received was properly identified and that the seal had not been broken.

14. The court finds that according to the custodian's testimony, that he believes himself to be an expert on "chain of custody" given his criminal background.

15. In December 2015, the custodian admitted to Grant Wargel a DCS assessment worker to recently using methamphetamine.

16. The custodian admitted at [trial] to using marijuana stating that "I smoke my weed". The custodian has a history of marijuana use.

17. [Mother] has witnessed the custodian use marijuana.

18. [Mother] stated that she would allow the custodian to be around the children even if he was impaired by drugs so long as it was marijuana.

19. The custodian has a history of drug use and has recently abused multiple drugs including methamphetamine. [Mother] has relied on the custodian as a caregiver and will very likely rely on him in the future despite his issues with drug abuse.

20. The custodian is unlikely to cooperate with the DCS or participate in services absent court intervention, as neither the custodian nor [Mother] seem concerned about the custodian's drug use despite his role as a caregiver.

21. The Court finds that in the [Mother's] testimony she stated that marijuana was completely different from methamphetamine and therefore marijuana was not bad.

22. When asked if a parent should be drug and alcohol free, [Mother] responded, "to some extent".

23. Moreover, the custodian has been belligerent to the DCS cursing DCS workers. Two DCS workers cut short a meeting with the custodian out of fear after he stated to them he was going to "dismember the DCS."

24. The threat to "dismember the DCS" cannot be given any positive connotation. Whether the threat was aimed at specific

persons or the agency, the Court finds this type of language to be intimidating.

25. The Court finds the custodian's behavior and demeanor to be problematic. During the trial, the Court witnessed the custodian act in volatile, hostile, threatening, and aggressive manners at various times throughout the trial.

26. The custodian has missed visits with the children when given an opportunity to visit.

27. The custodian testified, "I am the perfect dad".

28. Without the intervention of the Court the family is unlikely to receive necessary services such as drug treatment and parenteral [sic] education.

## CONCLUSIONS OF LAW

* * * * *

6. The Court now finds by a preponderance of the evidence that the allegations of the petition alleging child in need of services are true in that:

    a. The children's physical and mental condition is seriously impaired due to the inability, refusal or neglect of the parents to provide the said child with the necessary supervision.

    b. The children need care, treatment and/or rehabilitation that:

> > i. they were not receiving before removal, and
>
> > ii. they are unlikely to receive without the coercive intervention of the Court.

Appellant's Appendix at 8-11.

An entry in the chronological case summary dated May 26, 2016, states that the Children were removed from the home and the court authorized the detention of the Children. In June, 2016, the court held a dispositional hearing. The court indicated that the Children remained in foster care and reaffirmed its previous finding of CHINS. It ordered R.M. to obtain a substance abuse evaluation and follow any treatment recommendations, submit to random drug screens, participate in supervised or monitored visitation, remain drug and alcohol free, and maintain weekly contact with the family case manager.

### Discussion

The issue is whether sufficient evidence supports the juvenile court's determination that the Children are CHINS. In reviewing a juvenile court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied.* Instead, we consider only the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* DCS is required to prove by a preponderance of the evidence that a child is a CHINS. *In re A.H.*, 913 N.E.2d 303, 305 (Ind. Ct. App. 2009). When a court's order contains specific findings of fact and conclusions of law,

we engage in a two-tiered review. *Id.* First, we determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the judgment. *Id.* We reverse the juvenile court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if it is unsupported by the findings and conclusions. *Id.* When deciding whether the findings are clearly erroneous, we consider only the evidence and reasonable inferences therefrom that support the judgment. *Id.*

[17] Ind. Code § 31-34-1-1 provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

The CHINS statute, however, does not require that a court wait until a tragedy occurs to intervene. *In re A.H.,* 913 N.E.2d at 306. Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.* The purpose

of a CHINS adjudication is not to punish the parents, but to protect the child. *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*.

[18] Mother argues that DCS did not present any evidence regarding impairment to the mental or physical condition of the Children, or Mother and R.M. being unwilling or unable to provide supervision, care, food, shelter, or to provide for any of the other needs of the Children. She asserts that no evidence was submitted to determine whether any harm came to the Children or how they were seriously endangered or to show that Mother or R.M. were ever under the influence of substances while in the presence of the Children.

[19] R.M. argues that no witness testified seeing him under the influence of drugs and that his anger and disruption of a family team meeting merely show poor social skills and do not support a finding that the Children were CHINS. He contends that evidence was not presented to support Finding 19 that he abused multiple drugs and that the screen should not have been admitted due to improper documentation and handling. He acknowledges that the record demonstrates that he admitted to using methamphetamine one to two times per year as well as THC.

[20] To the extent R.M. asserts that the drug screen should not have been admitted, we note that he does not point to the record to demonstrate that he objected to the admission of the positive drug screen. Without objection, Martin, the toxicologist, testified that he received a sample from R.M. that was collected on December 7, 2015, and that the sample tested positive for methamphetamine

and THC. Further, R.M. concedes that the evidence showed that he admitted to using methamphetamine and THC.

[21] Mother and R.M. cite *Perrine v. Marion Cty. Office of Child Services*, 866 N.E.2d 269 (Ind. Ct. App. 2007), and *In re L.P.*, 6 N.E.3d 1019 (Ind. Ct. App. 2014), and Mother also cites *In re S.M.*, 45 N.E.3d 1252 (Ind. Ct. App. 2015). In *Perrine*, the court held that a single admitted use of methamphetamine, outside the presence of a child and without more, was insufficient to support a CHINS determination. 866 N.E.2d at 277. In *In re L.P.*, the court reversed a conclusion that a child was a CHINS and observed that the State proved a single use of methamphetamine, that there was no suggestion that it took place in the presence of the child, and mother voluntarily and consistently took drug screens with negative results. 6 N.E.3d at 1021. In *In re S.M.*, the court observed that every single drug screen mother provided during the CHINS case was clean and noted that one of the fathers admittedly had ongoing substance abuse issues, but was already receiving substance abuse services through another CHINS case and would continue to receive those services so long as that case remained open. 45 N.E.3d at 1256, 1256 n.3.

[22] We find those cases distinguishable. The record reveals that R.M. was the children's caregiver during times when Mother was working and a father figure to the children, that he tested positive for methamphetamine, and that he admitted to smoking marijuana. During the January 8, 2016 meeting, R.M.'s behavior was erratic, volatile, and threatening and resulted in the early termination of the meeting. On January 27, 2016, Mother told FCM Givens

that she could not go inside her residence, and R.M. told FCM Givens "to get the f--- off his property . . . ." Transcript at 80. DCS assessment worker Krizsovenszky testified that methamphetamine is a mind altering substance and can alter the caregiver's decision making and supervision which would put the Children at risk. FCM Givens testified that a service of supervised visitation for R.M. was set up, but R.M. had not participated. She also testified that R.M. needed to complete substance abuse evaluation and follow all recommendations. Mother testified that she would allow R.M. to be around the Children if he was impaired by drugs and later clarified that someone should not be under the influence of methamphetamine but that marijuana would not impair R.M.'s ability to take care of the Children. Based upon the record, we conclude that the judgment reached by the trial court is not clearly erroneous.

## *Conclusion*

[23] For the foregoing reasons, we affirm the juvenile court's determination that the Children are CHINS.

[24] Affirmed.

Vaidik, C.J., and Bradford, J., concur.